STATE OF NORTH CAROLINA v. MICHAEL BRUTON

No. COA03-1159

(Filed 17 August 2004)

**1. Homicide— instructions—malice—deadly weapon**

The instruction on malice in a first-degree murder prosecution was not plain error where the trial court noted that the knife used to stab the victim was not the cause of her death and omitted references to a deadly weapon.

**2. Homicide— instructions—malice—just cause**

There was no error in a first-degree murder instruction which omitted "without just cause, excuse or justification" from its definition of malice. Defendant's theory at trial was that he did not participate in the murder, not that he killed the victim with "just cause, excuse, or justification."

**3. Arson— instructions—malice and intent**

There was no plain error in a first-degree arson instruction in which the jury was told that the State was required to show that defendant acted with malice, meaning that it was necessary to show that defendant acted intentionally.

**4. Homicide; Arson— sufficiency of evidence—defendant as perpetrator**

The trial court did not err by denying defendant's motion to dismiss charges of first-degree murder and first-degree arson where defendant argued that there was insufficient evidence that he was the perpetrator but concedes that the evidence establishes that he was present, and there was other evidence that a reasonable mind might accept as adequate to support a conclusion that defendant committed these crimes.

**5. Evidence— expert testimony—blood splatter**

Admission of testimony from a forensic serology expert on blood splatter was not an abuse of discretion. Although defendant questioned the witness's qualifications as an expert on blood splatter, it was reasonable to conclude that her extensive experience with blood evidence made her better qualified than the jury to form an opinion as to the cause of particular bloodstains.

**6. Indictment and Information— notice of charge—international treaty—no private cause of action**

A first-degree murder defendant's reliance on the International Covenant on Civil and Political Rights was misplaced. That treaty was not self-executing and did not create a private cause of action.

**7. Homicide— first-degree murder—short-form indictment—constitutional**

The short form indictment for first-degree murder does not violate constitutional notice requirements.

Appeal by defendant from judgments dated 8 November 2002 by Judge William Z. Wood, Jr. in Superior Court, Forsyth County. Heard in the Court of Appeals 26 May 2004.

*Attorney General Roy Cooper, by Special Deputy Attorney General John F. Maddrey, for the State.*

*Daniel Shatz for defendant-appellant.*

McGEE, Judge.

Michael Bruton (defendant) was convicted on 7 November 2002 of first degree murder and first degree arson. The jury convicted defendant of first degree murder on the basis of malice, premeditation, and deliberation, as well as under the felony murder rule. The trial court sentenced defendant to life imprisonment without parole for the first degree murder conviction, and to a minimum term of sixty-four months to a maximum term of eighty-six months in prison for first degree arson, to be served consecutively.

The State's evidence at trial tended to show that Philomena Carter (Ms. Carter) died on 16 September 2000 from a lethal level of carbon monoxide in her blood due to smoke inhalation. Ms. Carter had also suffered numerous knife wounds to her head, blunt force trauma to both her head and chest, and defensive wounds to her hands. Ms. Carter's body was found in her house by the Winston-Salem Fire Department shortly after 2:00 p.m. on 16 September 2000. She was found lying on her back on the kitchen floor with a heavy metal chain wrapped around her left ankle. A blood-soaked garment, which smelled of an accelerant, was found in the kitchen. The Winston-Salem fire marshall located at least three pour patterns in Ms. Carter's residence, indicating points where some substance had

been thrown on the floor and lit in order to start the fire. It was the fire marshall's opinion that the fire had been set using an accelerant such as gasoline. A gasoline can was found in the utility room of the house.

Johnik Duncan (Duncan) testified that on the day of the fire, defendant called Duncan about coming to her apartment. Defendant called Duncan again later that day and said he was dropping someone off in Walnut Cove. Defendant thereafter arrived at Duncan's apartment around 6:00 or 6:30 p.m. that day. He was driving a white Jeep Cherokee, which Duncan had not seen before. Duncan testified that defendant told her to tell anyone who asked that he had arrived at her apartment between 1:00 and 1:30 p.m. and that he had been driving a red Honda Civic. Duncan told the police later that night that defendant had arrived at her apartment that day between 1:00 and 1:30 p.m. She told the same story to defendant's mother. Subsequently, Duncan informed police that defendant had arrived at her apartment at about 6:30 p.m. and that he had been driving a white Jeep Cherokee.

She further testified that when defendant arrived at her apartment on September 16, he asked her to hold the keys to the Jeep Cherokee. Duncan later presented the keys to the police. The police located the Jeep Cherokee, which belonged to Ms. Carter, between two buildings at Duncan's apartment complex late on the evening of the fire. A partial print found on the passenger door of the Jeep Cherokee was not defendant's.

Melvina Atwater (Atwater) testified that she discovered a blue nurse's bag in the dumpster near her apartment on September 16, between 3:00 and 5:00 p.m. Atwater found Ms. Carter's identification badge in the bag. A police investigator with the Winston-Salem Police Department responded to Atwater's location and found other items in the dumpster belonging to Ms. Carter. A paper shopping bag in the dumpster contained a blue "DKNY" t-shirt and a knife. A gas nozzle was found near the bag. Defendant testified that the "DKNY" t-shirt was his. There was blood on the front and back of the "DKNY" t-shirt, and a DNA profile of the blood matched that of Ms. Carter.

Officer Oather Golding (Officer Golding) with the Walnut Cove Police Department testified that on September 17 about 3:15 a.m., he observed an individual, a "Mr. Freeman," rummaging through the trash bin at a car wash in Walnut Grove. Mr. Freeman produced from the bin a pocketbook containing Ms. Carter's wallet, which contained

Ms. Carter's identification. Officer Golding took the pocketbook from Mr. Freeman and contacted the Winston-Salem Police Department.

A search of defendant's bedroom revealed a "Pepsi" t-shirt wrapped around a blade and handle, gray fleece cotton sweatpants, and a gray "Fubu" t-shirt. The sweatpants and "Fubu" t-shirt tested positive for residual gasoline. A latent print found on the broken knife blade was from defendant's right palm. The blood present on the broken knife blade had a mixture of DNA profiles, with the predominant profile matching Ms. Carter's. The weaker DNA profile was consistent with defendant. A blood sample taken from the sweatpants contained a mixture of Ms. Carter's DNA profile and that of another person. The DNA profile obtained from the "DKNY" t-shirt found in the dumpster matched the DNA profile of Ms. Carter, but not defendant.

Defendant testified that on 16 September 2000, he was dressed in gray sweatpants, a "Fubu" t-shirt, and the "DKNY" t-shirt. Defendant noted that the sweatpants seized by the police were not his. He arrived at Ms. Carter's home that day at 10:00 a.m. to assist her in disposing of an old mattress. According to defendant, as he and Ms. Carter returned from the dump, Ms. Carter mentioned that a guy was supposed to help her do some yard work that day, and defendant agreed to return to help.

Defendant stated at trial that he ate lunch at home that day and then returned to Ms. Carter's residence at around 1:30 p.m. Defendant testified he was introduced by Ms. Carter to a tall black man with a beard. He noticed in the driveway a lime green truck with paint peeling off of it. The man asked to have something to drink and Ms. Carter invited the man and defendant to come into the house. Defendant testified that while he was in the bathroom, he heard a thump and then found the unidentified man holding a knife. Ms. Carter's body was prone on the kitchen floor and blood was present. The man grabbed defendant by his "DKNY" t-shirt and then took defendant's identification and money. The man handed the knife to defendant and told defendant to place it in a paper bag, along with defendant's "DKNY" t-shirt. The man threatened to harm defendant's family if defendant did not comply.

According to defendant, the man gave defendant the keys to the Jeep Cherokee and told defendant to drive home and change his clothes while the man followed in his truck. As defendant left Ms. Carter's home, he noticed flames. He further testified that he went home, changed his clothes, and then drove the Jeep Cherokee to the

Summit Square apartment complex. The man and defendant took the Jeep Cherokee to a car wash in Walnut Cove. As the man and defendant were returning to Winston-Salem, the man jumped out of the Jeep Cherokee and ran between some buildings. Defendant then drove the Jeep Cherokee to Duncan's apartment. Thereafter, defendant telephoned his mother and paged the police after his mother informed him that the police were looking for him. Defendant stated that he did not put any items in the dumpster at the Summit Square Apartment Complex and that Duncan lied when she said that she saw defendant drive up in the Jeep Cherokee. Defendant previously told the police different versions of the events of 16 September, which defendant later admitted were fictional, but has subsequently maintained that the man with the green truck committed the offense.

I.

[1] Defendant first argues that the trial court erred in instructing the jury as to the element of malice required of first degree murder and first degree arson. Defendant contends that the trial court's instruction to the jury as to malice reduced the State's burden of proof as to malice, enabling the State to obtain a conviction without proving each element of the criminal offense.

Defendant failed to object to the instructions at trial and he now asserts plain error. Our Supreme Court has established that plain error review is limited to errors originating from a trial court's jury instructions or a trial court's rulings on admissibility of evidence. *State v. Golphin*, 352 N.C. 364, 460, 533 S.E.2d 168, 230 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001), *cert. denied*, 358 N.C. 157, 593 S.E.2d 84 (2004). "Under the plain error rule, defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

First degree murder is defined as the intentional and unlawful killing of a human being with malice, premeditation and deliberation. *State v. Coplen*, 138 N.C. App. 48, 59, 530 S.E.2d 313, 321, *cert. denied*, 352 N.C. 677, 545 S.E.2d 438 (2000).

> [M]alice, as it is ordinarily understood, means not only hatred, ill will, or spite, but also that condition of mind which prompts a person to take the life of another intentionally, without just cause, excuse, or justification, or to wantonly act in such a manner as to manifest depravity of mind, a heart devoid of a sense of social duty, and a callous disregard for human life.

*State v. Crawford*, 329 N.C. 466, 481, 406 S.E.2d 579, 587 (1991). Malice, in terms of hatred, ill will or spite, is generally referred to as express malice; whereas, implied malice originates from a condition of mind that prompts a person to intentionally inflict damage without just cause, excuse or justification. *State v. Sexton*, 357 N.C. 235, 237, 581 S.E.2d 57, 58 (2003). Furthermore, it is well-established that "[t]he intentional use of a deadly weapon gives rise to a presumption that the killing was unlawful and that it was done with malice." *State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 388 (1984); *see also State v. Taylor*, 155 N.C. App. 251, 266, 574 S.E.2d 58, 68 (2002), *cert. denied*, 357 N.C. 65, 579 S.E.2d 572 (2003).

Noting that the knife used in the offense was not the cause of Ms. Carter's death, the trial court indicated that it would instruct the jury as to first degree murder in accordance with pattern jury instruction 206.14, but would "take out references to a deadly weapon." The trial court forecasted its instruction as to first degree murder and defendant did not object to the proposed language. Pursuant to the proposed instruction, the trial court informed the jury as to the malice component of first degree murder:

> First, that the [d]efendant intentionally and with malice killed the victim. Malice means not only hatred, ill-will or spite, as it is ordinarily—malice means not only hatred, ill-will or spite as it's ordinarily understood, to be sure, that is malice, but malice also means that condition of mind which prompts a person to take the life of another intentionally.

Defendant contends that it was incorrect for the trial court to edit out the portion of the instruction regarding the use of a deadly weapon and to omit the phrase that the killing was done "without just cause, excuse or justification," which is included in the pattern jury instruction. Defendant correctly asserts that the State must show either actual or implied malice on the part of defendant. However, it is defendant's contention that implied malice is limited to instances in which there is a presumption of malice based on the use of a deadly weapon, and because the trial court deemed the instruction as to use of a deadly weapon to be inapplicable, it was the State's burden to show actual malice.

In *Sexton*, our Supreme Court noted that "malice, like intent, is a state of mind and as such is seldom proven with direct evidence. Rather, malice is ordinarily proven by circumstantial evidence from which it may be inferred." *Sexton*, 357 N.C. at 238, 581 S.E.2d at 58

(recognizing that the definition of malice in arson cases is the same as in homicide cases). In so deciding, our Supreme Court rejected the defendant's claim that a showing of express malice is required in arson cases. *Id.* Furthermore, in addressing the presence of malice in the context of a killing, our Supreme Court has stated that "[c]ircumstances immediately connected with the killing by defendant, the viciousness and depravity of his acts and conduct attending the killing, are evidence of malice and properly considered." *State v. Fleming*, 296 N.C. 559, 563, 251 S.E.2d 430, 432 (1979).

At trial, there was substantial evidence of blunt force trauma and knife wounds inflicted on Ms. Carter, as well as the implicit savagery of the heavy chain draped around her ankle. Further, the medical evidence indicated she was alive at the time her home was consumed by fire, and that her death was the result of carbon monoxide poisoning.

Contrary to defendant's assertion, we do not view the trial court's instruction as creating a presumption of malice; instead, the State rightly bore the burden of showing malice as provided by the trial court's instruction. Malice could be proven by direct or circumstantial evidence. Thus, this Court finds no error in the trial court's instruction to the jury as to malice in terms of first degree murder.

[2] We note that defendant also asserts that the trial court erred in failing to include the phrase, "without just cause, excuse or justification" in its definition of malice. However, defendant failed to present further argument on the relevance of the omission beyond simply citing its absence as error. Furthermore, defendant's theory at trial was that he did not participate in the murder, not that he killed Ms. Carter under circumstances involving "just cause, excuse or justification." Since defendant's strategy at trial did not concern whether defendant acted with "just cause, excuse or justification," we conclude that the omission of that clause from the trial court's jury instruction was not in error.

[3] Defendant also argues that the trial court incorrectly instructed the jury as to the definition of malice as an element of first degree arson. In instructing the jury as to first degree arson, the trial court stated that first degree arson was the "malicious burning" of an occupied dwelling house and that malice meant "without just []cause or excuse." Moments later, the trial court instructed the jury that for its members to find defendant guilty of first degree arson, the State must prove, *inter alia,* that defendant "did this burning mali-

ciously, that is, that he intentionally and without justification or excuse burned this house."

Although admitting that the State need not demonstrate actual ill will towards the owner of the property, defendant asserts that the trial court's instruction alleviated the State's burden to demonstrate that defendant acted with the intent to damage the property of another.

In reviewing jury instructions for plain error, the instructions at issue must be viewed in their entirety. *State v. Stevenson*, 327 N.C. 259, 265, 393 S.E.2d 527, 530 (1990). The trial court instructed the jury that the State was required to show that defendant acted with malice, meaning that it was necessary for the State to show he acted intentionally. Thus, we conclude that the trial court's instruction as to malice in terms of first degree arson was not in error.

Defendant's assignments of error numbers two and three are overruled.

II.

[4] In defendant's assignment of error number nine, he contends that the trial court erred by denying his motion to dismiss. We disagree.

In considering a motion to dismiss, the trial court must view "all the evidence . . . in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Pierce*, 346 N.C. 471, 491, 488 S.E.2d 576, 588 (1997). The State is required to produce substantial evidence (1) of each essential element of the offense charged and (2) of the defendant being the perpetrator of the offense. *State v. Robinson*, 355 N.C. 320, 336, 561 S.E.2d 245, 255, *cert. denied*, 537 U.S. 1006, 154 L. Ed. 2d 404 (2002). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Franklin*, 327 N.C. 162, 171, 393 S.E.2d 781, 787 (1990).

In the case before us, defendant argues that the State failed to present substantial evidence that he was the perpetrator of the offenses. Defendant concedes that the State's forensic and circumstantial evidence "undeniably establishes that [defendant] was present when Ms. Carter was killed and that he handled the knife which was used to cut her." In addition, the State presented evidence that defendant was found in possession of Ms. Carter's Jeep Cherokee,

that clothes recovered from his bedroom had gasoline residue, that his "DKNY" t-shirt with Ms. Carter's blood on it was found with Ms. Carter's identification badge, and that the knife discovered in defendant's bedroom had a mixture consistent with Ms. Carter's and defendant's DNA. We find that this evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" that defendant committed the crimes for which he was convicted. Defendant's assignment of error number nine is without merit.

## III.

**[5]** Defendant next argues that the trial court erred by allowing an expert in forensic serology to testify regarding the nature of blood splatter. The analysis of bloodstain pattern interpretation is appropriate for expert opinion testimony. *State v. Goode*, 341 N.C. 513, 530, 461 S.E.2d 631, 641, (1995).·

State Bureau of Investigation Agent Jennifer Elwell (Agent Elwell), in discussing her analysis of the blood on defendant's "DKNY" t-shirt, detailed the difference between cast off or impact spatter and a transfer pattern. She noted that there was "some definite cast off or impact spatter on the front of the shirt," as well as transfer. According to Agent Elwell a transfer blood pattern occurs when a bloody item comes in contact with a non-bloody area and cast off spatter is indicative of when blood begins to pool on an object and a force is applied to that pool of blood.

In *Goode*, our Supreme Court noted that in determining whether a witness is qualified to testify as an expert witness,

> "[i]t is not necessary that an expert be experienced with the identical subject matter at issue or be a specialist, licensed, or even engaged in a specific profession. It is enough that the expert witness 'because of his expertise is in a better position to have an opinion on the subject than is the trier of fact.' " Further, "the trial judge is afforded wide latitude of discretion when making a determination about the admissibility of expert testimony."

*Goode*, 341 N.C. at 529, 461 S.E.2d at 640-41 (citations omitted). After concluding that a witness may testify as an expert, the trial court must further determine whether the proffered evidence is relevant. *See* N.C. Gen. Stat. § 8C-1, Rule 401 (2003) (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

STATE v. BRUTON

[165 N.C. App. 801 (2004)]

Defendant does not argue Agent Elwell's testimony is not relevant. He does, however, contest her qualifications to testify as an expert witness as to bloodstain pattern interpretation. As a forensic serologist, Agent Elwell was trained to examine evidence for the presence of body fluids, such as blood, semen, and saliva. It is not unreasonable to conclude that, based on her extensive experience with blood evidence, she would be better qualified than a jury to form an opinion as to the cause of particular bloodstains. Thus, we cannot say that it was an abuse of the trial court's discretion to permit Agent Elwell's testimony. Defendant's assignment of error number seven is overruled.

IV.

[6] In his final argument, defendant assigns error to the trial court's denial of his motion to dismiss and to its entry of judgment convicting defendant of first degree murder. Defendant contends that Article 14(3)(a) of the International Covenant on Civil and Political Rights requires that a defendant be informed "promptly and in detail in a language which he understands of the nature and cause of the charge against him."

Defendant's reliance on the International Covenant on Civil and Political Rights is misplaced. It is evident from the legislative history at the time the treaty was ratified by the United States that Article 14(3)(a) was not to be regarded as self-executing. 138 Cong. Rec. S4781, at S4784 (1992) (The U.S. Senate's resolution of ratification includes the declaration that Articles 1 through 27 of the treaty are not to be self-executing). Furthermore, S. Exec. Rept., No. 102-23, 102nd Congress, 2nd Session, 15 (1992) stipulates that the purpose of including in the ratification of the treaty a declaration that those portions of the treaty are not self-executing "[i]s to clarify that the Covenant will not create a private cause of action in U.S. Courts." Defendant does not present any argument that the treaty created a private right of action.

[7] Defendant also contends that the indictment is insufficient to meet the notice requirement of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Our Supreme Court has "consistently held that the short-form indictment is sufficient to charge a defendant with first-degree murder." *State v. Barden*, 356 N.C. 316, 384, 572 S.E.2d 108, 150 (2002), *cert. denied*, 538 U.S. 1040, 155 L. Ed. 2d 1074 (2003); *State v. Braxton*, 352 N.C. 158, 174, 531 S.E.2d 428, 437 (2000), *cert.*

*denied,* 531 U.S. 1130, 148 L. Ed. 2d 797 (2001). Specifically, "the short-form indictment is sufficient to charge first-degree murder on the basis of any of the theories, including premeditation and deliberation, set forth in N.C.G.S. § 14-17, which is referenced on the short-form indictment." *Braxton,* 352 N.C. at 174, 531 S.E.2d at 437. Therefore, we find defendant's assignments of error numbers four and five to be without merit.

Finally, "[a]ssignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned." N.C.R. App. P. 28(b)(6). Accordingly, this Court will not consider defendant's remaining assignments of error.

No error.

Judges McCULLOUGH and ELMORE concur.